UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PERDITA DREPAUL,<br>Plaintiff,<br>  v.<br>WELLS FARGO BANK, N.A.,<br>Defendant. | No. 3:23-CV-00123-MPS |

**RULING ON MOTION TO DISMISS**

Perdita Drepaul, filed an amended complaint against her former employer, Wells Fargo Bank, N.A. She asserts claims for disability discrimination under the Americans with Disabilities Act (ADA) and the Connecticut Fair Employment Practices Act (CFEPA) alleging that she was terminated because she was disabled with COVID-19. She also asserts claims of retaliation and interference under the Family and Medical Leave Act (FMLA). Wells Fargo moved to dismiss Drepaul's amended complaint, asserting that Drepaul's allegations did not show that she was not disabled under either the ADA or CFEPA or that it had interfered with or retaliated against her for exercising her FMLA rights. For the following reasons, I dismiss the ADA, CFEPA, and FMLA interference claims, but deny the motion to dismiss the FMLA retaliation claim.

I.     **FACTUAL BACKGROUND**

The following allegations, taken from the amended complaint, are accepted as true for purposes of this ruling.

Wells Fargo Bank, N.A. (Wells Fargo) hired Perdita Drepaul (Drepaul) as a teller on June 24, 2002. ECF No. 19 ¶ 14. She worked at the branch located at 86 North Main Street,

1

Wallingford, Connecticut.  *Id*. ¶ 20.  Drepaul was promoted to Branch Manager and was supervised by the district manager, Jeff Bruneau.  *Id*. ¶¶ 18, 21-23.

In January 2021, although she was not experiencing any symptoms, Drepaul took a COVID-19 test.  ECF No. 19 ¶ 24.  Drepaul's test results came back positive for COVID-19 while she was at work.  *Id*. ¶ 25.  Drepaul called her manager, who told her to call Employee Relations.  *Id*. ¶ 26.  Employee Relations told Drepaul to immediately exit the building.  *Id*.  Drepaul informed her supervisor that she had been instructed to leave the building; Drepaul's supervisor told her to complete the branch closing procedures first.  *Id*. ¶ 29.  The operations consultant asked her to post signs on the doors of the building before she left and she did so.  *Id*. ¶ 30.

Although Drepaul was not symptomatic the day she tested positive for COVID-19, she became symptomatic while out on leave.  ECF No. 19 ¶ 32.  Drepaul's symptoms included body ache, coughing, headaches, chills, lightheadedness, loss of taste and smell, and brain fog.  *Id*. ¶ 58.  Drepaul had at least two telemedicine visits with her treating health care provider "within 30 days of incapacity caused by COVID-19 infection."  *Id*. ¶ 69.  During the telemedicine appointments, Drepaul's health care provider advised her to take over-the-counter medication, to lay down if she felt shortness of breath, and to go to the hospital if she experienced difficulty breathing.  *Id*. ¶¶ 66, 68.  While she was out sick, Wells Fargo sent Drepaul multiple check-in texts, which put pressure on Drepaul to return to work.  *Id*. ¶¶ 44-45.

Drepaul's health care provider medically cleared Drepaul to return to work.  ECF No. 19 ¶ 43.  Drepaul called Employee Relations about returning to work multiple times and left messages each time.  *Id*. ¶ 40.  Employee Relations did not get back to Drepaul until January 25,

2021, the day she returned to work. *Id*. ¶¶ 36, 42. That day she called Technology Connection for a password reset and was told that she had been active since January 22, 2021. *Id*. ¶ 35.

Drepaul was terminated on February 4, 2021. ECF No. 19 ¶ 37. Wells Fargo told Drepaul that she was "terminated for professionalism" and that Drepaul had come to work sick and had returned to work without approval. *Id*. ¶ 38. Wells Fargo has a corrective action policy and practice. *Id*. ¶ 46. Drepaul did not receive corrective action prior to her termination. *Id*. ¶ 47. Other employees went to work sick and were not terminated. *Id*. ¶ 51.

Drepaul claims that she was terminated because of her actual or perceived disability and in violation of the FMLA. As a result, Drepaul alleges she has been deprived of wages and benefits.

## II.  PROCEDURAL BACKGROUND

On August 18, 2021, Drepaul filed dual complaints against Wells Fargo with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC). ECF No. 19 ¶¶ 53, 55. On January 24, 2023, Drepaul received a release of jurisdiction from the CHRO. *Id*. ¶ 54. On April 13, 2023, the EEOC issued a Right to Sue Letter to Drepaul. *Id*. at 17

Drepaul initiated this action on January 31, 2023 by filing a complaint against Wells Fargo. On May 17, 2023, Drepaul filed an Amended Complaint in response to Wells Fargo's first Motion to Dismiss. On June 7, 2023, Wells Fargo filed a Motion to Dismiss the Amended Complaint alleging that the Amended Complaint fails to state a claim upon which relief may be granted because Drepaul failed to allege plausible facts demonstrating a disability under either the ADA or CFEPA or a causal relationship between any disability and her termination and failed to plead either retaliation or interference under the FMLA. Drepaul objected to the Motion

3

to Dismiss the Amended Complaint on June 28, 2023. Wells Fargo filed a reply brief on July 12, 2023 and a Notice of Supplemental Authority on December 11, 2023.

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41, 41 (2d Cir. 2017) (quoting *Ashcroft*, 556 U.S. at 678 (citations and internal quotation marks omitted)). Although the Court must accept the factual allegations as true and "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims...." *Scott v. Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

"[W]hat must be plausibly supported by facts alleged in the complaint [in an employment discrimination case]," the Second Circuit has held, "is that the plaintiff is a member of the protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

### IV. DISCUSSION

#### A. Count I: Disability Discrimination in Violation of C.G.S. §46a-60(b)(1)

Wells Fargo argues that Drepaul has failed to allege facts suggesting that she is disabled. ECF No. 23-1 at 10. The CFEPA makes it unlawful for an employer to discharge from

employment an individual "because of" the individual's physical disability.  Conn. Gen. Stat. § 46a–60(b)(1).  "Physically disabled," within the meaning of the statute, "refers to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury... or from illness…." Conn. Gen. Stat. § 46a–51(15).  This definition of disability is broader than the ADA's, although the two statutes are otherwise construed similarly.  *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F.Supp.2d 240, 255-56 (D. Conn. 2013) ("Discriminatory claims brought under CFEPA are construed similarly to ADA claims … The only relevant difference … is in defining physical disability.  CFEPA's definition … is broader than the ADA's." (internal quotation marks and citations omitted)).

Under CFEPA, a "chronic physical handicap, infirmity, or impairment" means one "of long duration, or characterized by slowly progressive symptoms … distinguished from acute," and "[l]asting a long time, long-continued, lingering, inveterate."  *Caruso v. Siemens Bus. Sys., Inc.*, 56 Fed.Appx. 536, 537 (2d Cir. 2003) (citing Oxford English Dictionary (2d ed.1989) and *Gilman Brothers Co. v. Connecticut Comm'n on Human Rights and Opportunities,* 1997 WL 275578 at *4 (Conn. Super. Ct. May 13, 1997); *see also Logan v. SecTek, Inc*., 632 F.Supp.2d 179, 184 (D. Conn. 2009) (finding that back injury that started September 22, 2006 and was resolved by February 17, 2007, was not a chronic impairment: "The statute does not define chronic, but courts have defined it as marked by long duration or frequent recurrence or always present or encountered … with reference to disease, the term chronic has been defined to mean of long duration, or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance; distinguished from acute" (internal citation and quotation marks omitted)).

5

In addition to individuals who are, in fact, disabled, CFEPA also "protects individuals who are *regarded as* physically disabled from employment discrimination." *Desrosiers v. Diageo N. Am., Inc.*, 314 Conn. 773, 794 (2014) (emphasis added).

Drepaul alleges contradictory dates for the duration of her disease. She first alleges that "[i]n January 2021" she tested herself for COVID-19 in preparation for a visit to her elderly mother, and at the time, she was not experiencing any COVID-19 symptoms. ECF No. 19 ¶ 24. Her test results came back positive for COVID-19 while she was working at Wells Fargo's Wallingford branch and Wells Fargo's Employee Relations instructed her to leave the building that same day – the date itself is not specified. *Id*. ¶¶ 25, 27. She alleges that her symptoms arose while she was out on leave. *Id*. ¶ 32. These symptoms included body aches, coughing, headaches, chills, lightheadedness, loss of taste and smell, and brain fog. *Id*. ¶ 58. Her health care provider cleared Drepaul to return to work, without restriction, before she returned to work on January 25, 2021, at which point she was no longer experiencing any symptoms. *Id*. ¶ 82. But Drepaul also alleges that her "medical leave of absence due to COVID-19 illness was from late December 2020 through January 24, 2021." *Id*. ¶ 57. She does not address this discrepancy in her brief even though Wells Fargo pointed it out in its motion. Nonetheless, because I must construe the complaint in the light most favorable to Drepaul and draw all reasonable inferences in her favor, I treat the complaint as alleging that Drepaul's COVID-19 symptoms lasted from "late December 2020 to January 24, 2020" – about one month.

The facts presented in the amended complaint do not suggest that Drepaul's disease was "of long duration or characterized by slowly progressive symptoms; deep-seated or obstinate, or threatening a long continuance." *Wanamaker v. Westport Bd. Of Educ.*, 899 F.Supp.2d 193 (D.Conn 2012) (citation omitted). Drepaul left work sometime in late December 2020 and

6

returned to work on January 25, 2021; she asserts that her symptoms developed and fully resolved within approximately a month. She has not alleged that she requested any accommodations when she returned to work. Drepaul has not pled facts from which I can draw a plausible inference that she had a "chronic physical handicap, infirmity or impairment." Conn. Gen. Stat § 46a–51(15); s*ee Boutillier v. Hartford Public Schools*, 221 F. Supp.3d 255, 261, 274 (D. Conn. 2016) (where plaintiff teacher suffered pulmonary embolism and hysterectomy that resulted in her absence during first half of the school year, court held that these "serious medical events within a single school year" "were prototypical acute conditions" and were not chronic, granting summary judgment in favor of defendant on CFEPA claim); *Setkoski v. Univ. of Connecticut Health Ctr.*, 2012 WL 2044802 *2 (Conn. Super. Ct. May 10, 2012) (dismissing CFEPA claim where plaintiff's anemia caused three-month leave of absence but was not a "chronic" disability, because plaintiff did "not allege that her condition [was] continuing or require[d] medication or additional procedures").

Because Drepaul has failed to allege a qualifying disability, Count One is dismissed.

**B.      Count II: Disability Discrimination in Violation of the ADA**

The ADA prohibits discrimination on the basis of disability. 42 U.S.C. § 12112. The statute, as amended by the ADA Amendments Act of 2008, defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Drepaul claims that as a "result of defendant's unequal treatment and discrimination, [she] has been deprived of her employment and equal employment opportunities" because of her "actual or perceived" disability. ECF No. 19 ¶ 94.

7

1. **Actual Disability**

"[A]n impairment will be considered a disability under the ADA if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Anderson v. National Grid, PLC*., 93 F.Supp.3d 120, 135 (E.D.N.Y. March 25, 2015) (internal quotation marks omitted). "A medical diagnosis alone does not necessarily demonstrate that a plaintiff had an impairment under the ADA. Rather, the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." *DeAngelo v. Yellowbook Inc*., 105 F. Supp. 3d 166, 174 (D. Conn. 2015).

The EEOC, which is charged with enforcing the ADA and other employment discrimination laws, has addressed the extent to which COVID-19 amounts to a disability: "A person infected with the virus causing COVID-19 who is asymptomatic or a person whose COVID-19 results in mild symptoms similar to those of the common cold or flu that resolve in a matter of weeks - with no other consequences - will not have an actual disability within the meaning of the ADA." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws,* at N.2 *When is COVID-19 or Long COVID an actual disability under the ADA*? (Updated 5/15/23); *see Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir. 2001) (Because EEOC bears responsibility for implementing ADA, courts generally defer to its regulations in construing ADA); *see also Telesford v. N.Y.C. Dep't of Ed.,* 2018 WL 11598670 *5 n.5 (E.D.N.Y. Sept. 17, 2018). While the EEOC guidance goes on to discuss other circumstances in which COVID-19 or "Long COVID" may amount to a disability – for example, "[a]n individual diagnosed with COVID-19 who experiences ongoing but intermittent multiple-day headaches, dizziness, brain fog, and difficulty concentrating, which the employee's doctor

attributes to the virus, is substantially limited in neurological and brain function, concentrating, and/or thinking, among other major life activities" and "[a]n individual diagnosed with COVID-19 who initially receives supplemental oxygen for breathing difficulties and has shortness of breath, associated with fatigue, and other virus-related effects that last, or are expected to last, for several months, is substantially limited in respiratory function, and possibly major life activities including exertion, such as walking" -  it makes clear that "[a]n individual who is diagnosed with COVID-19 who experiences congestion, sore throat, fever, headaches, and/or gastrointestinal discomfort, which resolve within several weeks, but experiences no further symptoms or effects … does not have an actual disability under the ADA." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, at N.4 *What are some examples of ways in which an individual with COVID-19 might or might not be substantially limited in a major life activity?* (Updated 5/15/2023).

Again, at best, Drepaul alleges that her symptoms lasted for about one month.  As noted, she alleges they included "body aches, coughing, headaches, chills, lightheaded[ness], loss of taste and smell and brain fog." *Id*. ¶ 58.  Drepaul alleges these symptoms "are physical and mental impairments that substantially limit recognized major life activities." ECF No. 24 at 12-13.  But "plaintiffs must plead more than vague or conclusory allegations regarding difficulty or trouble conducting a major life activity" to sufficiently allege a substantial limitation.  *Shine v. New York City Hous. Auth*., 2020 WL 5604048, at *7 (S.D.N.Y. Sept. 18, 2020).  Drepaul does not describe the extent of limitation caused by COVID-19 or her ensuing symptoms or allege facts suggesting that her symptoms affected any major life activities.  While she alleges she suffered from "brain fog," she does not suggest that this symptom was ongoing or intermittent.  To the contrary, she alleges she was symptom-free when she returned to work on January 25.

Further, while Drepaul claims that she had two telemedicine visits and that her health care provider instructed her to treat her symptoms with over-the-counter medications and to go to the hospital if she experienced difficulty breathing, ECF No. 19 ¶¶ 66, 69, she does not claim that she ever sought treatment at a hospital.  Nor does she allege that she needed or sought any accommodations upon returning to work.

Taken at their most expansive, Drepaul's allegations indicate she made a full recovery from COVID-19 within about four weeks.  This does not suggest a substantial limitation of her ability to perform a major life activity, even where "substantially limits" is "construed broadly in favor of expansive coverage," 29 C.F.R. § 1630.2(j)(1)(i), as it must be.  When she left work, she was not yet experiencing symptoms and when she returned she was no longer experiencing symptoms.  Further, Drepaul fails to describe with any detail "the frequency, duration, or severity" of any limitation on a major life activity even during the one-month period she was experiencing symptoms.  *Kelly v. New York State Office of Mental Health*, 200 F.Supp.3d 378, 393 (E.D.N.Y. August 9, 2016).  In short, Drepaul has failed to allege facts suggesting that it was plausible that she suffered from an actual disability under the ADA.

    **2. Perceived Disability**

Drepaul also alleges that she was "regarded as" disabled by Wells Fargo, which is an alternative path to demonstrating a disability under the ADA.  42 U.S.C. § 12102(1).  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12104(3)(A).  Drepaul does not have to "show that the employer had a reasonable basis for perceiving her as suffering from a

disability; the statute merely requires her to show that the employer did so perceive her." *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 606 (E.D.N.Y. 2013).

The complaint makes no allegations suggesting that anyone at Wells Fargo perceived Drepaul as disabled. There are no allegations suggesting that anyone made any remarks to her or anyone else about her having a disability, about any inability she had to perform particular tasks, or about any accommodations she might need. To the contrary, Drepaul claims that Wells Fargo sent her texts during her absence that "put pressure on [her] to return to work." ECF No. 19 ¶ 45. And while she does allege that she told Wells Fargo that she had tested positive for COVID-19, that she was suffering the symptoms described in the complaint, and that she was seeing her "health care provider (general practitioner/internal medicine doctor) for her COVID-19 illness," she also alleges that when she returned to work on January 25 and told Employee Relations she was symptom-free, Employee Relations told her "you are all clear" and "you can be at work." ECF No. 19 ¶ 83. Merely telling her employer that she had COVID-19 and experienced COVID-19-like symptoms for four weeks — especially when she also told her employer her symptoms had resolved and her employer cleared her to return to work — is not a sufficient basis to find that she was "regarded as disabled." *See Kruger v. Hamilton Manor Nursing Home*, 10 F. Supp. 3d 385, 389–90 (W.D.N.Y. 2014) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action" (internal quotation marks and citation omitted)). If it were sufficient, then any employee who informed her supervisor of cold or flu symptoms that lingered for a month would be treated as disabled under the ADA. Because the complaint is devoid of allegations suggesting that Wells Fargo perceived Drepaul as disabled, she has failed to allege a "regarded as disabled" claim.

For the reasons stated above, Count II is dismissed.

## C. FMLA

"The Family and Medical Leave Act provides broad protections to employees who need to take time away from work to deal with serious health conditions of the employee or her family." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 165–66 (2d Cir. 2017) (citation omitted); *see* 29 U.S.C. § 2612(a)(1)(D) (eligible employees entitled to 12 work weeks of leave for, among others, "a serious health condition that makes the employee unable to perform the functions of the position of such employee[s]"). The FMLA authorizes claims for both retaliation and interference. *Id.* at 166. "In a general sense, an employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA. 'Retaliation' claims, on the other hand, involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer. The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA." *Woods,* 864 F.3d at 166 (internal citations omitted).

### 1. Count III: Retaliation Claim

The third count of the amended complaint asserts a claim of retaliation against Drepaul because she exercised her FMLA rights. ECF No. 19 ¶ 100. An employee asserting a FMLA retaliation claim must allege facts showing that: "(1) [she] exercised rights protected under the FMLA; (2) [she] was qualified for [her] position; (3) [she] suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir.2004); *Perry v. NYSARC, Inc*. 424 Fed.Appx. 23, 26 (2d Cir.2011) (summary order). Wells Fargo

disputes only the first and fourth elements: it asserts that Drepaul's retaliation claim fails because she "never requested or took FMLA leave [] and [that] there are no allegations to support an inference of retaliatory intent." ECF No. 29 at 8.

### a. Protected Activity

Drepaul claims Wells Fargo "received notice … that her COVID-19 illness was a qualifying event under the FMLA and failed to provide notice of the same to [her]." ECF No. 19 ¶ 86. "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA ... the employer will be expected to obtain any additional required information through informal means." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 109 (2d Cir. 2017). "The obligation of an employee to give notice of his need for FMLA leave is not … to provide the employer with all of the necessary details to permit a definitive determination of the FMLA's applicability at or before the time of the request;" rather, "an employee has provided sufficient notice to his employer if that notice indicates reasonably that the FMLA may apply." *Id.* at 111.

Drepaul's allegations are sufficient to plausibly suggest that she asserted her rights under the FMLA. She "informed her district manager and operations manager of the COVID-19 symptoms she was suffering from" and "that she was seeing her healthcare provider for her COVID-19 illness." *Id.* ¶¶ 64, 65. She experienced symptoms such as "body aches, coughing headaches, chills, lightheadedness, loss of taste and smell and brain fog." ECF No. 19 ¶ 58. She had "at least two telemedicine visits with her treating health care provider within 30 days of incapacity caused by COVID-19 infection." *Id.* ¶ 69. As discussed below, these allegations are sufficient to suggest that she suffered from a "serious health condition" under the FMLA, but in any event, they are easily enough to plead "notice indicat[ing] reasonably that the FMLA *may*

apply." *Coutard*, 848 F.3d at 111 (emphasis added), which is all that is required to satisfy the FMLA notice requirement.

### b. Retaliatory Intent

Drepaul returned to work on January 25, 2021 and was terminated on February 4, 2021. ECF No. 19 ¶¶ 36, 37. Courts in the Second Circuit have recognized in the summary judgment context that "[a]t the prima facie [case] stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity." *Risco v. McHugh*, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012); *see also Blake v. Recovery Network of Programs, Inc.*, 655 F.Supp.3d 39, 47 (D.Conn. 2023) (citing *Risco* and finding that a "gap of less than four weeks between [the plaintiff's] alleged FMLA request and her termination [was] sufficient to survive a motion to dismiss."). Here, Drepaul was terminated ten days after implementing her FMLA leave. The temporal proximity, only ten days, between her exercise of her right to take FMLA leave and her termination is sufficient, at this early stage, to establish the requisite causal connection between her protected activity and her termination.

Accordingly, I deny the motion to dismiss as to Count III, FMLA retaliation.

### 2. COUNT IV: Interference

A plaintiff asserting a claim of FMLA interference must allege, 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Wells Fargo claims Drepaul has not alleged three of the five elements: that she was entitled to FMLA leave,

that she gave notice to Wells Fargo that she intended to take FMLA leave, and that she was denied any benefits to which she was entitled under the FMLA. ECF No. 23-1 at 12.

Although it is a close call, I conclude that the complaint includes barely enough allegations to make it plausible that Drepaul was entitled to FMLA leave on the ground that she had a "serious health condition that ma[de her] unable to perform the functions" of her position. 29 U.S.C. § 2612(a)(1)(D). The statute defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital … or (B) continuing treatment by a health care provider." 29 U.S.C. Sec. 2611(11). Drepaul acknowledges she was not hospitalized but argues that she received "continuing treatment by a health care provider." Applicable regulations state that one circumstance qualifying under the "continuing treatment" provision is "incapacity and treatment," which involves three days of "incapacity" (i.e., inability to work, attend school, or perform other regular daily activities, 29 C.F.R. § 825.113) and "treatment [by a health care provider] two or more times within the first 30 days of incapacity" or treatment on one occasion resulting in a regimen of continuing treatment under the health care provider's supervision. 29 C.F.R. § 825.115.[1] Plaintiff alleges that her COVID-19 symptoms included "brain fog," that she was incapacitated for more than three days, and that she had at least two telemedicine visits with her health care provider within the first 30 days of her incapacity. ECF No. 19 ¶¶ 58, 67-70. It is reasonable to infer that, during her episode of "brain fog" and incapacity, she was unable to perform the functions of her position. So I find that these allegations, though spare, are just enough to nudge her complaint over the line between plausibility and legal insufficiency, notwithstanding that her other alleged

---

[1] The regulation states that the treatment requirement means "an in-person visit" with the health care provider, but plaintiff's complaint points to a Field Assistance Bulletin issued by the Department of Labor in connection with the COVID-19 pandemic indicating that it will treat telemedicine visits as "in-person" visits under the regulation. ECF No. 19 ¶¶ 73-75 (citing Wage & Hour Division Field Assistance Bulletin No. 2020-8).

COVID-19 symptoms fit squarely within another provision in the regulations describing conditions that do not amount to "serious health conditions." *See* ECF No. 19 ¶ 58 (alleging Drepaul suffered from "body aches, coughing, headaches, chills …."); 29 C.F.R. § 825.113 ("Ordinarily, unless complications arise, the common cold, the flu, ear earaches upset stomach, minor ulcers, headaches other than migraine … are examples of conditions that do not meet the definition of a serious health condition …."). And, as discussed above, Drepaul informed her managers of sufficient information about her symptoms and medical care to infer that she gave notice of a potential FMLA claim to Wells Fargo.

But I agree with Wells Fargo that Drepaul does not point to any benefit she did not receive that she might have been entitled to under the FMLA. ECF No. 29 at 9. Drepaul alleges that she took leave due to COVID-19 from "late December 2020 through January 24, 2021," ECF No. 19 ¶ 57, returning to work on January 25, 2021. She does not allege that anyone at Wells Fargo denied her request for leave or discouraged her or sought to prevent her from taking leave. To the contrary, she alleges that when she told Wells Fargo's Employee Relations that she had COVID-19, employee Relations told her to leave work. ECF No. 19 ¶ 27.

Drepaul argues, however, that the FMLA provides for job-protected leave and alleges that termination within ten days of job restoration is FMLA interference. ECF No. 24 at 21. This argument, however, is duplicative of Drepaul's retaliation claim, and Drepaul cites no authority recognizing *both* a FMLA interference claim *and* a FMLA retaliation claim based on an employee's termination following her taking of FMLA leave. Indeed, it is not clear why Congress would have authorized, in the same sentence in a single statutory provision, two causes of action for the same remedies to address the same conduct. And the Second Circuit's description of the interference and retaliation causes of action under the FMLA confirm that they

16

were aimed at protecting against different conduct: "The two types of claims serve as *ex ante* and *ex post* protections for employees who seek to avail themselves of rights granted by the FMLA, with an 'interference' claim" protecting against the employer's "prevent[ing] or otherwise imped[ing] the employee's ability to exercise rights under the FMLA," and a retaliation claim protecting against the employer's taking "some adverse employment action" after the employee "actually exercise[es] her rights or oppos[es] perceived unlawful conduct under the FMLA . . ." *Woods*, 864 F.3d at 166; *see also Leclair v. Berkshire Union Free School Dist.,* 2010 WL 4366897 *6 (N.D.N.Y. Oct. 28, 2010) (where plaintiff was permitted to take leave, was not discouraged from taking leave, and all leave requests were granted, her claim "that the act of terminating her employment [after she had taken FMLA leave] was itself a form of interference" was "merely a retaliation theory in disguise.") *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (plaintiff's theory that he was terminated "due to alleged performance problems that resulted from the very use of his FMLA leave" was "no more than an effort to dress Di Giovanna's retaliation claim in (barely) different clothing").  Because Drepaul does not allege an independent claim of interference with her FMLA rights, I GRANT the motion to dismiss as to count IV.

## V. CONCLUSION

For the reasons above, I grant the motion to dismiss (ECF No. 23) in part and I deny it in part.  The case will proceed on Count III only.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
January 11, 2024